UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 13-CV-3519 (JFB)()
_____

KENNETH DECTER AND
ANDREW DECTER, a minor over the age of 14 by his father, KENNETH DECTER,

Plaintiffs,

VERSUS

SECOND NATURE THERAPEUTIC PROGRAM, LLC, RIGHT DIRECTION CRISIS
INTERVENTION, SKEZICS CORP., AND BRIAN T. SHEPHERD,

Defendants.
_____

MEMORANDUM AND ORDER
September 5, 2014
_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Kenneth Decter ("Kenneth") and his son Andrew Decter ("Andrew") bring this action alleging that defendants Right Direction Crisis Intervention ("Right Direction") and Skezics Corp. ("Skezics") abducted, falsely imprisoned, and assaulted Andrew when they transported him from New York to Utah to attend a therapeutic wilderness camp run by defendant Second Nature Therapeutic Program ("Second Nature"). In doing so, plaintiffs allege that defendants also intentionally inflicted emotional distress upon them and interfered with Kenneth's visitation rights with Andrew, pursuant to a Judgment of Divorce which awarded full custody of Andrew to his mother, Ellyn Sosin Decter ("Ellyn").

Defendants argue that Ellyn authorized defendants to transport Andrew to Utah and attend the wilderness camp, by hiring defendants and executing a power of attorney which granted Second Nature all the powers of a custodial parent. Plaintiffs do not dispute the authenticity of the power of attorney or its terms, nor do they dispute that Ellyn hired defendants. Based on Ellyn's consent to their conduct, defendants have moved to dismiss the amended complaint or, in the alternative, for summary judgment. Plaintiffs have moved to amend the amended complaint, in order to allow Andrew to assert his claims as an adult, because he recently turned 18.

For the reasons explained below, the Court grants summary judgment on all claims brought by Kenneth Decter, on behalf of himself. Plaintiffs have not cited authority from New York (or any other jurisdiction) supporting the existence of a tort cause of action by a non-custodial parent against a third party for violation of visitation rights, particularly where the

custodial parent has consented to the alleged interference. Here, it is uncontroverted that (1) Ellyn had sole legal and physical custody of Andrew; and (2) Ellyn executed a power of attorney that, among other things, delegated to Second Nature, while Andrew was in their custody, the powers of a parent or guardian with respect to his care and custody. Thus, in the instant case, the Court holds that the non-custodial parent in this case has no tort cause of action against a third party under New York law for alleged interference with his visitation rights (pursuant to a Stipulation of Settlement in a Judgment of Divorce) where the custodial parent consented to the child being placed in the custody of that third party for a period of approximately 30 days, and thereby allegedly deprived the non-custodial parent of his visitation rights. Accordingly, summary judgment on Kenneth's claims brought on behalf of himself—namely, false imprisonment, intentional infliction of emotional distress, tortious interference with parental and visitation rights, alienation of affection, abduction of child, conspiracy and piercing the corporate veil—is warranted in defendants' favor. In reaching this decision, the Court emphasizes that it is not concluding that Kenneth would have no recourse against the custodial parent. Similarly, the Court is not concluding that a custodial parent would have no cause of action against a third party for knowingly assisting in an unlawful abduction of a child. Instead, the Court's narrow ruling is that the *non-custodial* parent has no cause of action *against a third party* where the custodial parent consented to the custody by the third party. To hold otherwise would create a novel claim under New York law that would potentially create liability to various institutions—such as schools, camps, and day-care centers—who are caught in the middle of a marital dispute over visitation rights involving the child. This Court finds no basis for the creation of this cause of action under current New York law.

Similarly, because it is uncontroverted that the custodial parent gave consent to the defendants to take custody of Andrew, the claims brought by Kenneth, on behalf of Andrew, based solely on the fact that defendants exercised custody over Andrew—namely, false imprisonment, abduction, and alienation of affections—cannot survive summary judgment. However, the claims regarding Andrew's treatment while in the custody of the third party defendants—namely, intentional infliction of emotional distress and assault—are not necessarily foreclosed by the fact that Ellyn consented to custody pursuant to the Power of Attorney. In other words, accepting all of the facts in the Amended Complaint as true and drawing all reasonable inferences in plaintiffs' favor, plausible claims for intentional infliction of emotional distress and assault have been stated. Thus, the motion to dismiss those claims is denied. To the extent that defendants seek to have the Court consider those claims under a summary judgment standard (and have submitted affidavits rebutting and explaining Andrew's allegations of harsh treatment), the Court declines, in its discretion, to consider a summary judgment motion on these claims at this time. Plaintiff is entitled to discovery related to his claims of assault and intentional infliction of emotional distress, and defendants may renew their summary judgment motion on these claims at the conclusion of discovery, if they wish.

Finally, plaintiffs' motion to amend to assert claims on behalf of Andrew as an adult, because he has now turned 18, is granted to the extent that Andrew may submit an amended complaint containing claims for intentional infliction of emotional

2

distress and assault. Any other amendments would be futile given the legal defects that the Court has identified with respect to the other claims asserted by Kenneth or Andrew.

I. BACKGROUND

A. Factual Background

The following facts are taken from the Amended Complaint ("AC"), including documents incorporated by reference therein (such as the Judgment of Divorce and Stipulation of Settlement regarding custody and visitation), and they are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to plaintiffs, the non-moving parties. For purposes of the summary judgment motion, the Court has also considered the Power of Attorney executed between Ellyn and Second Nature, and the Declaration of Authority granted by Ellyn to Right Direction, which are not disputed by the plaintiffs.[1]

Plaintiffs are a father and his minor son. (AC ¶¶ 10-11.) In 2002, Kenneth divorced Andrew's mother, Ellyn, who received "sole legal and physical custody" of Andrew, while Kenneth was granted visitation twice per week and daily telephone contact. (*Id*. ¶¶ 12, 41; Ex. C[2] to Pl. Mot. to Amend at 3, 30.)

In the summer of 2012, Andrew was between his junior and senior years of high school and living with his mother in Manhasset, New York. (AC ¶ 14.) In the early morning of June 20, 2012, Andrew awoke at approximately 5:00 a.m. with three large men in his bedroom, two of whom were standing over him while the third blocked the door. (*Id.* ¶ 15.) The men displayed handcuffs, and "[a] struggle ensued as . . . Andrew tried desperately to escape." (*Id.* ¶¶ 15, 17.) The men told Andrew that they were taking him to Utah, and that they would stop any attempt by him to escape. (*Id.* ¶¶ 17-18.) Andrew asked to speak with his father, or with a friend or attorney, but the men refused. (*Id.* ¶¶ 20-21.) Andrew briefly attempted to flee, but to no avail. (*Id*. ¶ 22.)

The men in Andrew's room were employees or agents of defendant Skezics, (*id*. ¶ 16), who Ellyn hired to take Andrew to Second Nature's wilderness camp in Utah. Skezics is a Utah corporation, and the AC describes defendant Brian Shepherd as a Utah resident and "a principal of Skezics and/or Right Direction." (*Id.* ¶¶ 6-9, 117.) Defendant Second Nature is also a Utah corporation, and runs the wilderness camp in Utah to which Andrew was taken. (*Id.* ¶¶ 6, 23-27.) On May 30, 2012, Ellyn executed a power of attorney "in order that Second Nature may, if necessary, in its judgment, authorize or provide care and treatment to [Andrew]" and "to delegate to Second Nature while [Andrew] is in Second Nature's custody, any of the powers of the parent or guardian with respect to [Andrew] regarding his care and custody." (Second

---

[1] Plaintiffs also have not objected to the Court considering these documents in connection with defendants' summary judgment motion.
[2] Exhibit C to plaintiffs' motion to amend the complaint is a copy of the September 20, 2002 order of the Nassau County Supreme Court granting a Judgment of Divorce and incorporating the Stipulation of Settlement executed by Kenneth and Ellyn on July 25, 2002. The AC refers to the document throughout (*see* AC ¶¶ 12, 41, 45, 51) and,

thus, may be considered at the motion to dismiss stage. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). In any event, defendants have filed a motion for summary judgment in the alternative, and this document is undisputed.

3

Nature 56.1 ¶ 6.) Likewise, Ellyn executed a separate Declaration of Authority authorizing Andrew's transport to Second Nature. (Ex. C to Skezics Mot.)[3]

Once he arrived at Second Nature, Andrew was forced to wear an orange jumpsuit, hike several miles through difficult terrain with a backpack, eat freeze-dried food, and bathe from a bag of water. (AC ¶¶ 28-37.) His boots were taken from him each night, and he lost 25 pounds. (*Id.* ¶¶ 31-32.) He repeatedly asked to speak with his father or an attorney, but defendants refused his requests until July 17, 2012, when he was released from Second Nature and first able to speak with his father by phone. (*Id.* ¶¶ 36-37, 50.)

Kenneth did not know that Andrew was going to Second Nature, and became alarmed when he did not speak to Andrew on June 20, 2012. (*Id.* ¶ 42.) Prior to that date, he and Andrew spoke on the phone at least once a day and spent at least two days each week together, as was provided for in Kenneth's Judgment of Divorce and the Stipulation of Settlement he reached with Ellyn. (*Id.* ¶¶ 38-41; Ex. C. to Pl. Mot. to Amend, at 3, 30.) When Kenneth learned that Andrew went to Second Nature, he called Second Nature and demanded to know whether Andrew was there, but the Second Nature employee who answered would neither confirm nor deny Andrew's presence. (*Id.* ¶ 44.) Kenneth's attorney made similar inquiries, which were also refused. (*Id.* ¶ 45.) The AC states that defendants prevented Kenneth from speaking to his son despite their knowledge of his right to daily telephone contact and weekly visitation, as outline in the divorce judgment and the Stipulation of Settlement, although at some point they allowed Kenneth to speak with a therapist, who told him that Andrew was "fine." (*Id.* ¶¶ 46, 49.) Kenneth eventually spoke to Andrew on July 17, 2012, when he was released from Second Nature. (*Id.* ¶¶ 50, 53.)

B. Procedural History

Plaintiffs filed the complaint in this action on June 20, 2013. On August 12, 2013, they filed the amended complaint cited above. On October 28, 2013, at a pre-motion conference, defendants informed the Court that Ellyn's consent and power of attorney could be dispositive of plaintiffs' causes of action. Defendants stated that they intended to move to dismiss the amended complaint, while moving in the alternative for summary judgment. Defendants then moved under Federal Rules of Civil Procedure 12 and 56 on December 6, 2013. On January 28, 2014, plaintiffs responded in opposition while also cross-moving to amend the amended complaint. Defendants opposed the motion to amend and replied in further support of their motion on March 20 and 21, 2014, and plaintiffs replied in support of the motion to amend on April 8, 2014. The Court heard oral argument on April 25, 2014.

II. STANDARD OF REVIEW

Defendants have moved to dismiss and, in the alternative, for summary judgment, contending that Ellyn had sole custody of Andrew and that her hiring of defendants, combined with her execution of a power of

---

[3] As noted above, the AC does not allege the existence or terms of these documents, nor does it allege that Ellyn hired defendants. Those facts are taken from defendants' statements of undisputed facts, submitted under Local Rule 56.1, and the power of attorney and Declaration of Authority, which were attached as exhibits. Plaintiffs have not disputed the terms of these documents. (Pl. Resp. to Skezics 56.1 ¶¶ 5-7; Pl. Resp. to Second Nature 56.1 ¶ 6.)

4

attorney authorizing them to take custody of Andrew, is dispositive of plaintiffs' causes of action. As noted above, in an abundance of caution, the Court has considered the motion as one for summary judgment under Federal Rule of Civil Procedure 56 in order to consider the power of attorney document.[4] However, in its discretion, the Court declines to apply the summary judgment standard to Andrew's claims for assault and intentional infliction of emotional distress, and will consider those claims only under Federal Rule of Civil Procedure 12.[5]

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that

---

[4] Arguably, the power of attorney is integral to the AC and could be considered under the Rule 12 standard, but it is unclear when plaintiffs became aware of the power of attorney. Thus, in an abundance of caution, the Court considers it as part of the summary judgment motion. Plaintiffs have not objected to the Court considering that document, and the document is uncontroverted.

[5] "Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment." *Carione v. United States*, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005) (internal quotation marks and citation omitted). The Court will not apply the summary judgment standard to Andrew's remaining claims without affording him the opportunity to engage in discovery on those claims. Accordingly, the Court applies the Rule 12 standard to those claims, meaning that the Court must accept the factual allegations set forth in the amended complaint as true and draw all reasonable inferences in Andrew's favor. *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

5

there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

III. DISCUSSION

Although plaintiffs assert "Interference with Parental and Visitation Rights" as their fourth cause of action, the Court discusses it first because it most squarely addresses the primary issue presented by this motion: the rights of Kenneth, a non-custodial parent, against third parties acting with the express consent of Ellyn, the custodial parent. The discussion then turns to the causes of action for false imprisonment, abduction, assault, and intentional infliction of emotional distress, and finally to the additional theories of conspiracy and piercing the corporate veil, and the request for punitive damages.

A. Interference with Visitation Rights

"[T]he existence and contours of a tort cause of action for interference with parental custody under New York law are far from clear." *Pittman by Pittman v. Grayson*, 149 F.3d 111, 120 (2d Cir. 1998). To the extent that the tort exists under New York law, it is "rather narrow." *Id.* at 121 (quoting *Casivant v. Greene Cnty. Cmty. Action Agency, Inc.*, 652 N.Y.S.2d 115 (N.Y. App. Div. 1996)).

The fourth cause of action, brought by Kenneth alone, is captioned "New York Common Law Tortious Interference with Parental and Visitation Rights," which suggests that Kenneth is attempting to enforce two different sets of rights. With respect to "parental" rights, plaintiffs have not cited, nor has this Court identified, any cause of action related to such rights. Most cases involve the more specific right of custody, and it is undisputed that Ellyn has sole physical and legal custody of Andrew.

"'Physical custody' means the physical care and supervision of a child." N.Y. D.R.L. § 75-a.14. Although New York law does not define "legal custody," *Bagot v. Ashcroft*, 398 F.3d 252, 261 (3d Cir. 2005), it is clear that a custodial parent has broad authority to make decisions about her child's welfare, *see Fuentes v. Bd. of Educ. of N.Y.C.*, 540 F.3d 145, 152-53 (2d Cir. 2008) (reviewing New York law), including how to discipline her child, and to transport him to a place he does not want to go. *See Offenhartz v. Cohen*, 543 N.Y.S.2d 867, 868 (N.Y. Sup. Ct. 1989). "Whether the subject matter is religion, health care, or education, absent an agreement, the court will not interfere with the custodial parent's decisions regarding the children's upbringing." *De Luca v. De Luca*, 609 N.Y.S.2d 80, 81 (N.Y. App. Div. 1994). The rights described in *De Luca* are enforceable by Ellyn, not Kenneth.

*De Luca*'s broad description of the custodial parent's rights "absent an agreement" also highlights a second important aspect of the division of rights between Ellyn and Kenneth: their rights are defined by contract. Here, the parties' Stipulation of Settlement—which was incorporated into the court-ordered Judgment of Divorce—grants Ellyn "sole legal and physical custody" of Andrew, and assigns no decisionmaking authority to Kenneth. (Ex. C. to Pl. Mot. to Amend, at 3, 30.) Where an agreement or custody order does not designate particular authority to the non-custodial parent, that parent has no right

6

to control major decisions about the child's welfare. *Fuentes v. Bd. of Educ. of N.Y.C.*, 12 N.Y.3d 309, 314 (2009) (emphasizing "the importance of parties determining these issues at the time of separation or divorce").

Thus, as a threshold question, Kenneth had no general parental right to determine whether his son attended defendants' program in Utah. Ellyn had that right as the custodial parent. The most that Kenneth can assert are his rights under the divorce order, which are *visitation* rights. Although visitation is a "natural" right of parents, *Weiss v. Weiss*, 52 N.Y.2d 170, 174 (1981), and can be ordered by a court, visitation is often defined and enforced by a stipulation or contract, as happened here. For example, a parent's right of visitation may be dependent or independent of the obligation to pay child support, based on the language of the separation agreement. *Compare Callender v. Callender*, 325 N.Y.S.2d 420, 422 (N.Y. App. Div. 1971) (dependent), *with Greene v. Greene*, 221 N.Y.S.2d 236, 238 (N.Y. Sup. Ct. 1961) (independent). Although it does not appear that the New York Court of Appeals has considered this precise question, the fact that visitation rights are defined and enforced by contracts strongly suggests that a non-custodial parent seeking to enforce his visitation rights must do so against his contractual counter-party, the custodial spouse. *See Eller v. Eller*, 524 N.Y.S.2d 93, 94 (N.Y. App. Div. 1988) ("The [non-custodial parent's] remedies . . . for violation of court-ordered visitation are more properly limited to the adequate remedies at law, viz., contempt, preclusion to challenge the order, enforcement of support provisions and a possible change of custody.").

Plaintiffs have not identified, and the Court has not discovered, any case under New York law where a non-custodial parent successfully sued a third party for interference with visitation rights.[6] At least one New York court has explicitly rejected such a cause of action where, as here, the custodial parent consented to or caused the alleged interference.[7] In *McGrady v. Rosenbaum*, a father alleged that his former wife abandoned him, and after he refused to divorce her, she took their child to Nevada, where she obtained a unilateral divorce and custody of their son. 308 N.Y.S.2d 181 (N.Y. Sup. Ct. 1970), *aff'd*, 324 N.Y.S.2d 876 (N.Y. App. Div. 1971). The couple subsequently litigated the custody issue in New York courts, where the father was awarded weekly visitation. *Id.* The father eventually sued for interference with his visitation rights when the mother moved with their son to Israel, with no intention of returning. *Id.* at 184. In the suit, he named his former wife and her parents as defendants, alleging that the latter financed her trip, physically assisted her in removing the child, and conspired with her. *Id.* The court held that these allegations failed to state a claim against the mother's parents, "who have a right to assist" their child in the exercise of her own lawful custody. *Id.* at 186.

---

[6] At oral argument, the Court asked plaintiffs again to identify such a case, and plaintiffs were not able to do so.

[7] The Second Circuit has even cast doubt on the ability of a parent with joint custody to sue a third party for its complicity in violating his custodial rights. *Pittman*, 149 F.3d at 122 ("In sum, the validity of Icelandair's contention that the New York courts would not recognize a cause of action in favor of either Frederick or Elizabeth for money damages against Erna, Elizabeth's joint custodian, for traveling with Elizabeth in violation of a court order, is unclear. We conclude, however, that we need not decide that question in this case."). *A fortiori*, a non-custodial parent's ability to sue third parties is even more doubtful, and plaintiffs have not cited cases, under New York law, where such a cause of action has been recognized.

In reaching its decision, *McGrady* specifically distinguished the primary case on which plaintiffs rely here, *Pickle v. Page*, 252 N.Y. 474 (1930), because there, the plaintiffs were the child's lawful custodians.[8] In *Pickle*, the plaintiffs were grandparents who had legally adopted their grandchild, and they sued a county sheriff who aided the mother in illegally taking back the child. *Id.* at 475. Thus, the suit was "[a]n action of trespass for the abduction of a child," *id.* at 476, maintainable by "lawful custodians, parents, or foster parents." *Id.* at 482. The *McGrady* court noted that *Pickle* "provide[s] no foundation for liability as against a mother, who has lawful custody of the child or as against the mother's parents, who have a right to assist her." 308 N.Y.S.2d at 186. In other words, *Pickle* involves the enforcement of rights *by* custodial parents, not *against* them and those acting with their consent, and plaintiffs have cited no case where *Pickle* was used in the reverse manner.

To the extent that Kenneth's visitation rights were violated, his cause of action may lie against Ellyn, not defendants. *See Pittman*, 149 F.3d at 121 ("[New York] courts have indicated that a noncustodial parent who has visitation rights has a cognizable claim against the custodial parent for removal of a child from the jurisdiction in violation of the court order permitting visitation, . . although they have stated that the remedies for such a violation do not include money damages") (citing *McGrady*, 308 N.Y.S.2d at 188). As noted, plaintiffs do not dispute that Ellyn authorized defendants to engage in the acts described in the Amended Complaint. (Pl. Resp. to Skezics 56.1 ¶¶ 5-7; Pl. Resp. to Second Nature 56.1 ¶ 6.) New York recognizes Ellyn's authority to do so as the custodial parent, and plaintiffs have not identified any authority suggesting that a third party may be liable for interference with a non-custodial parent's visitation rights, where the custodial parent consented to the alleged interference. Accordingly, the Court grants summary judgment to defendants with respect to the cause of action for interference with parental and visitation rights.

B. False Imprisonment and Abduction

Ellyn's authority as the custodial parent to send Andrew to Utah, and the uncontroverted power of attorney granted to Second Nature (and the separate Declaration of Authority granted to Right Direction), likewise forecloses plaintiffs' causes of action for false imprisonment and abduction. Although each cause of action involves slightly different elements, they share in common a history of being dismissed by New York courts when they are asserted in the context of a marital dispute. For example, in *Offenhartz*, the plaintiff child sued her mother's attorney for allegedly advising and assisting the mother in the assault and abduction of the child. 543 N.Y.S.2d at 868. The court dismissed these claims because the child's mother had legal custody of her. Even though the mother shared custody with the father, the court noted that either parent would have the "right to the pick up that child and—without using excessive force—put her in a car to take her home . . . . even if the child would rather not go." *Id.* Therefore, just like in *McGrady*, the allegation in *Offenhartz* that a

---

[8] The only other case which plaintiffs cite directly to support the existence of a tort against third parties is *Lisker v. City of New York*, 338 N.Y.S.2d 359 (N.Y. Sup. Ct. 1972), in which a child's mother alleged that she was the custodial parent and refused consent for her child's placement in a foster home. Thus, *Lisker* is inapposite here, because Kenneth is the non-custodial parent and Ellyn, the custodial parent, granted consent to defendants.

8

parent merely exercised her legal right did not state a claim against one who advised or assisted her to do the same.[9] *Id.*; *see also Anonymous v. State*, 236 N.Y.S.2d 88 (N.Y. App. Div. 1963) ("[T]he physicians of the State mental institution were justified in administering [shock] therapy in reliance upon the signed consent of the father and that the contention of appellant that such treatment constituted an assault and battery is unmeritorious."). Likewise here, defendants cannot be liable for carrying out Ellyn's wishes. If Ellyn could have transported Andrew to Utah "without using excessive force," *id.*, then defendants could have done the same on her behalf.[10] (SAC ¶ 18.) Therefore, given Ellyn's authority as the sole custodial parent and her unconverted consent to defendants taking custody of her son, the claims for false imprisonment and abduction cannot survive summary judgment.

Although *Offenhartz* and *Anonymous*, cited above, both involved lawsuits brought by plaintiff children, their logic applies not only to Andrew's claims but to Kenneth's as well. In another case brought by a non-custodial father and his children against third parties, the Second Circuit reached a similar conclusion concerning the torts of abduction and false imprisonment. In *Leonhard v. United States*, the father had been granted visitation rights after a divorce, and the mother had custody of the children. 633 F.2d 599, 625 (2d Cir. 1980). The mother and her children entered protective custody after her second husband agreed to testify against members of organized crime, which had the effect of interfering with the father's visitation rights. *Id.* at 605. The Second Circuit held that there was no claim for abduction or false imprisonment against any third parties because the mother had legal custody of the children and consented to their placement in the program. *Id.* at 625-26 ("[The mother's] affidavit makes it clear beyond cavil that her, and the children's, removal and concealment were entirely voluntary. In these circumstances the children have no claim for abduction or false imprisonment."); *id.* at 626 n.41 ("It seems clear . . . that Leonhard could not prevail on an abduction claim because he was not entitled to custody of the children.").[11] Here, the same logic applies to

---

[9] For this same reason, the Court disagrees with plaintiffs that the power of attorney is legally invalid for public policy reasons. Plaintiffs cited no authority analogous to these circumstances and have not distinguished the facts of cases such as *Offenhartz* and *Anonymous*, much less the cases cited earlier describing a custodial parent's broad authority with respect to her child. *See, e.g.*, *Fuentes*, 540 F.3d at 152-53 (reviewing New York law). Therefore, the Court concludes that the power of attorney is valid.

[10] The proposed SAC alleges that defendants ensured Andrew's compliance during the trip to Utah by showing him handcuffs and blocking possible avenues of escape. (SAC ¶¶ 16, 24.) In a declaration submitted in opposition to the present motions, Andrew states that the men "forcefully restrained" him in his bedroom, with no additional detail and no allegation of any injury or pain. (Andrew Decter Decl. dated Jan 27, 2014, ¶ 6.) To the extent that these allegations describe force at all, it is not beyond the force that Ellyn was capable of authorizing as the custodial parent.

[11] *Leonhard* also cited § 700 of the Restatement (Second) of Torts, which addresses a similar theory of "Inducing Minor Child to Leave or Not to Return Home." Comment c to that section supports the Court's conclusion here, as it did the Second Circuit's in *Leonhard*: "When by law only one parent is entitled to the custody and earnings of the child, *only that parent can maintain an action* under the rule stated in this Section. *One parent may be liable to the other parent* for the abduction of his own child if by judicial decree the sole custody of the child has been awarded to the other parent." In other words, only the custodial parent may sue another for taking away the child. *See Leonhard*, 633 F.2d at 626 n.41 ("[A]t common law there is no cause of action for

9

both Kenneth's and Andrew's claims, and the Court grants summary judgment to defendants on the false imprisonment and abduction causes of action.[12]

### C. Intentional Infliction of Emotional Distress

Plaintiffs also assert claims for intentional infliction of emotional distress (IIED), based upon Andrew's experience in Utah and his father's experience trying to gain access to his son. The tort of IIED "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993). On a motion to dismiss, the element "most susceptible to determination as a matter of law" is the outrageousness element. *Id.*; *see also Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 586 (E.D.N.Y. 2011) ("Whether the conduct is 'outrageous' is a matter of law to be decided by the court."). Even at the pleading stage, "[t]his highly disfavored cause of action is almost never successful." *McGown v. City of New York*, No. 09 Civ. 8646(CM), 2010 WL 3911458, at *5 (S.D.N.Y. Sept. 9, 2010).

To survive a motion to dismiss, allegations of IIED must describe conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (internal quotation marks and citation omitted). "Such extreme and outrageous conduct must be clearly alleged in order for the complaint to survive a motion to dismiss." *Naughright v. Weiss*, 826 F. Supp. 2d 676, 697-98 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).

With respect to Kenneth, the IIED claim also cannot survive summary judgment. The only allegations concerning Kenneth involve defendants' alleged refusal to allow him to speak with his son. However, for the same reasons the other tort causes of action related to the alleged interference with visitation rights cannot survive summary judgment, this claim also cannot survive summary judgment. As discussed in detail above, defendants were not the subject of that order; rather, it is based on a contract between Kenneth and Ellyn. Thus, even if the Court assumes, in a light most favorable to plaintiffs, that defendants flatly refused to allow any communication between Kenneth and Andrew—even after Kenneth contacted defendants and informed them of his visitation rights—such conduct by Utah entities who are not parties to the Stipulation of Settlement or bound by the Judgment of Divorce is not "beyond all possible bounds of decency." *Murphy*, 58 N.Y.2d at 303. In short, Kenneth's interference with visitation rights and alienation of affections claims cannot be recast as an IIED claim. New York courts look with disfavor upon the use

---

abduction on behalf of the child abducted; that claim belongs to the parent who had custody of the child.").

[12] The SAC includes a fifth cause of action for alienation of affections, although plaintiffs did not highlight it in their papers. "To the extent that plaintiff is bringing an action for alienation of affections, he has no claim; New York has abolished all claims for alienation of affections by statute." *Davey v. Dolan*, 453 F. Supp. 2d 749, 754 (S.D.N.Y. 2006) (citing N.Y. C.R.L. § 80-a). In any event, even if such claim existed, it could not survive summary judgment for the same reasons the false imprisonment and abduction claims could not survive summary judgment. Therefore, the Court also grants summary judgment to defendants with respect to the alienation of affections claim.

10

of IIED arising out of the marital context. *See Eller*, 524 N.Y.S.2d at 94 (affirming dismissal of non-custodial parent's IIED claim based upon deprivation of visitation rights because "[s]trong policy considerations have been held to militate against allowing recovery for the intentional infliction of emotional distress in matters arising out of the interpersonal relationships in a matrimonial context," and noting that "[t]he defendant's claim as a noncustodial parent for monetary damages based upon the deprivation of her visitation rights is of the type contemplated as being against that public policy").

The policy considerations cited in *Eller* and other cases stem from the Legislature's decision to abolish the closely-related action for alienation of affections. *See Weicker v. Weicker*, 22 N.Y.2d 8, 11 (1968); *Xiao Yang Chen v. Fischer*, 6 N.Y.3d 94, 100 n.2 (2005) (reaffirming that *Weicker* remains good law). New York courts, thus, remain vigilant that plaintiffs may attempt to circumvent the Legislature's intent by recasting this abolished cause of action as an IIED claim. For example, in *Sahid v. Chambers*, the Appellate Division affirmed dismissal of an IIED claim where a father with visitation rights sued his children's psychiatrists for allegedly "brainwashing" them and thereby interfering with his visitation rights. 655 N.Y.S.2d 20 (N.Y. App. Div. 1997). The court held that "[d]espite an effort to frame this accusation in terms of intentional and negligent interference with visitation rights, intentional and negligent infliction of emotional distress, fraud, and unjust enrichment, the pleading alleges nothing more than alienation of affections, which is expressly prohibited by Civil Rights Law § 80–a." *Id.*; *see also Grafas v. TSK Franchise Sys., Inc.*, No. 09–CV–4914 (JS)(AKT), 2010 WL 2301295, at *1 (E.D.N.Y. June 2, 2010) ("Parties cannot evade [statute abolishing alienation of affection claims] by recharacterizing prohibited actions as emotional distress or fraud claims." (internal quotation marks and citations omitted)). Similarly, in the instant case, the Court concludes that Kenneth's IIED claim, which is based upon alleged interference with his visitation rights, cannot survive summary judgment.

With respect to Andrew's IIED claim, however, the analysis is different. Andrew's IIED claim is based not only on the fact of defendants' custody over him, but also on the conditions of his custody. For example, the Amended Complaint alleges, *inter alia*, the following with respect to the events at his home: (1) two men came into Andrew's bedroom at 5:00 a.m. to take him to Second Nature's camp in Utah, (2) the men displayed handcuffs to Andrew; (3) a struggle ensued; (4) Andrew begged to speak to his father and an attorney, but the men refused; (5) Andrew was terrified and feared for his life; (6) Andrew briefly attempted to flee, but to no avail. (AC ¶¶ 15-22.) The Amended Complaint also alleges that Andrew was transported "like a prisoner" to the camp in Utah, including displays of handcuffs and threats that he should not attempt to escape. (*Id.* ¶¶ 23-27.) With respect to the conditions of his custody in Utah at the camp, the Amended Complaint alleges, *inter alia*, the following: (1) Andrew was put in "prisoner type clothing – an orange jumpsuit"; (2) he was forced into the middle of the woods against his will; (3) once there, he was forced to hike numerous miles each day on grueling terrain, eat freeze-dried food, bathe from a bag of water and wear the same prison-like clothing for a month, and his sneakers/boots were taken from each night; and (4) as a result of the alleged mistreatment, he lost nearly 25 pounds. (*Id.* ¶¶ 28-34.) The

Amended Complaint further alleges that Andrew repeatedly asked to speak to his father and/or his attorney, and those requests were repeatedly denied until July 17, 2012. (*Id.* ¶¶ 36-37.)

The Court concludes that the allegations in the complaint, construed most favorably to Andrew, are sufficient to state a plausible IIED claim.[13] In connection with their motion, defendants have submitted declarations which seek to address these allegations. However, such declarations cannot be considered on a motion to dismiss. Moreover, in its discretion, the Court declines to consider a summary judgment motion on this claim before plaintiff has had an opportunity to conduct discovery with respect to these factual issues. Of course, defendants may renew their summary judgment, if they wish, once discovery is complete.

### D. Assault Claim

Andrew also brings an assault claim under New York Law. It is well settled that "[t]o sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Marilyn S. v. Indep. Grp. Home Living Program, Inc.*, 903 N.Y.S.2d 403, 894 (N.Y. App. Div. 2010) (internal quotations and citations omitted).

In the instant case, as discussed above, Andrew clearly alleges facts—in connection with the events at his home, during the transportation to the camp, and at the camp—that state a plausible claim for assault, that is, that defendants engaged in physical conduct placing him in imminent apprehension of harmful contact. Thus, the motion to dismiss that claim is denied. As with the IIED claim, defendants have submitted declarations that seek to provide justification for the alleged conduct. However, such explanations could only be considered on a motion for summary judgment, which the Court declines to consider prior to discovery on the circumstances surrounding the alleged conduct.

### E. Conspiracy, Corporate Veil, and Punitive Damages

To the extent that the Amended Complaint attempts to assert a separate claim for punitive damages, such claim is dismissed. There is no independent cause of action for punitive damages in New York. *See Mayes v. UVI Holdings, Inc.*, 723 N.Y.S.2d 151, 157 (N.Y. App. Div. 2001); *Steinberg v. Monasch*, 448 N.Y.S.2d 200, 202 (N.Y. App. Div. 1982). Thus, although Andrew may seek punitive damages in connection with an IIED claim and assault claim, it is dismissed to the extent it is asserted as a separate cause of action.

The Court reaches a similar conclusion as to the separate "piercing the corporate

---

[13] In addition to the allegations in the Amended Complaint, Andrew has submitted declarations alleging: (1) that he saw Second Nature's guards carry mace and knives, he was warned not to escape from the camp, and he witnessed other children be restrained at night if they were suspected of trying to escape (Decl. of Andrew Decter dated Jan 27, 2014, ¶¶ 19-23); and (2) that defendants did not deliver the letters Andrew sent to his father while he was being held in the wilderness (Decl. of Andrew Decter dated April 2, 2014, ¶¶ 4-5). Those allegations cannot be considered in connection with a motion to dismiss because they are not contained in the Amended Complaint. However, the Court need not consider these additional allegations at this juncture because the allegations in the Amended Complaint, for reasons discussed *supra*, are already sufficient to state a plausible claim. Of course, Andrew may add these additional allegations when he files the Second Amended Complaint (discussed *infra*).

veil" claim. Under New York law, "a separate cause of action to pierce the corporate veil does not exist independent from the claims asserted against the corporation." *9 East 38th St. Assocs., L.P. v. George Feher Assocs., Inc.*, 640 N.Y.S.2d 520, 521 (N.Y. App. Div. 1996) (citation omitted). Thus, although the piercing allegations may remain to attempt to support liability against various defendants, it is dismissed to the extent that it is alleged as a separate cause of action.

Finally, the conspiracy claim suffers from the same defect. It is axiomatic that civil conspiracy cannot be alleged as a separate claim because New York law does not recognize civil conspiracy as an independent tort. *See, e.g.*, *Rivera v. Greenberg*, 663 N.Y.S.2d 628, 629 (N.Y. App. Div. 1997) ("[T]he Supreme Court should have dismissed the plaintiff's thirtieth cause of action, which alleges conspiracy to defame, since New York does not recognize civil conspiracy as an independent tort." (citation omitted)); *accord Transit Mgmt., LLC v. Watson Indus., Inc.*, 803 N.Y.S.2d 860, 863 (N.Y. App. Div. 2005) ("[I]t is well established that New York does not recognize civil conspiracy as an independent tort."); *see also Treppel v. Biovail Corp.*, 03 Civ. 3002(PKL), 2005 WL 2086339, at *5 (S.D.N.Y. Aug. 30, 2005) ("Under New York law, a claim for civil conspiracy may stand only if it is connected to a separate underlying tort."). Therefore, to the extent that plaintiff alleges conspiracy as a separate cause of action, that separate claim must be dismissed. However, although it is not permitted as a separate cause of action, allegations of conspiracy may survive in a complaint under certain circumstances. As explained in *Transit Mgmt.*, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." 803 N.Y.S.2d at 863 (internal quotations and citation omitted). Thus, "[w]hile there is no cognizable action for a civil conspiracy, a plaintiff may plead conspiracy in order to connect the actions of the individual defendants with an actionable underlying tort and establish that those acts flow from a common scheme or plan." *Am. Preferred Prescription, Inc. v. Health Mgmt., Inc.*, 678 N.Y.S.2d 1, 3 (N.Y. App. Div. 1998). To properly plead civil conspiracy for these limited purposes, "a plaintiff must allege both a primary tort and also show the four elements of a conspiracy, namely: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008). Andrew's claims satisfy this pleading requirement. Therefore, although the Court dismisses the conspiracy claim as a separate cause of action, it will permit the conspiracy allegations to remain for the purposes described above.

F. Motion to Amend

"A district court has discretion to deny leave for good reason, including futility." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Leave to amend is futile if the amended complaint is meritless and would fail to state a claim. *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009). The proposed Second Amendment Complaint does not contain facts that overcome the legal defects

13

identified by the Court in this Memorandum and Order in connection with the claims that are being dismissed, nor could any such additional facts be alleged that could cure the legal defects. Accordingly, the motion to amend the claims that are being dismissed is denied as futile. However, the motion to amend is granted to the extent that it seeks to have Andrew assert the IIED and assault claims on his own behalf, because Andrew has now turned 18.

## IV. CONCLUSION

The Court grants defendants' summary judgment motion on all claims brought by Kenneth, as well as on the claims brought by Kenneth on behalf of Andrew for false imprisonment, abduction, and alienation of affections. The claims brought by Andrew for conspiracy, piercing the corporate veil, and punitive damages are dismissed only to the extent that they are alleged as separate causes of action (although the allegations supporting each of those theories of liability and damages can remain). Moreover, any motion to amend these claims is denied as futile.

However, defendants' motion is denied as to the claims brought by Andrew for intentional infliction of emotional distress and assault, and Andrew's motion to amend is granted to the extent that he wishes to re-plead those claims with himself as the plaintiff. In its discretion, the Court has not applied the summary judgment standard to those claims, and defendants may move for summary judgment with respect to the Second Amended Complaint once discovery is complete.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 5, 2014
       Central Islip, NY

\* \* \*

Plaintiffs are represented by Timothy Kilgannon, Kilgannon & Kilgannon, 1551 Kellum Place, Mineola, NY 11501. Defendant Second Nature is represented by Joan M. Gilbride, Kaufman Borgeest & Ryan, 120 Broadway, New York, NY 10271. Defendants Right Direction, Skezics, and Brian Shepherd are represented by Cristina Roseann Yannucci, Lewis Brisbois Bisgaard & Smith LLP, 77 Water Street, Suite 2100, New York, NY 10005.