**FILED**
**CLERK**
11/21/2014

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
                              .
Decter, et al.,               .    Docket #CV-13-3519 (JFB)
                              .
        Plaintiffs,           .
                              .    United States Courthouse
            V.                .    Central Islip, New York
                              .    April 25, 2014
Second Nature Therapeutic     .    3:49 p.m.
Program, LLC, et al.,         .
                              .
        Defendants.           .
...............................
```

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

| | |
|---|---|
| For The Plaintiffs: | Timothy Kilgannon, Esq.<br>Kilgannon & Kilgannon, LLP<br>1551 Kellum Place<br>Mineola, NY 11501 |
| For The Defendant:<br>(Second Nature Therapeutic<br>Program, LLC) | Tyra Saechao, Esq.<br>Kaufman Borgeest & Ryan<br>120 Broadway<br>New York, NY 10271 |
| For The Defendants:<br>(Right Direction Crisis<br>Intervention)<br>(Skevics Corp.)<br>(Brian T. Shepard) | Cristina Yannucci, Esq.<br>Lewis Brisbois Bisgaard<br>& Smith, LLP<br>77 Water St.-Ste. 2100<br>New York, NY 10005 |

Audio Operator:

Transcribing Firm:           Writer's Cramp, Inc.
                                     6 Norton Rd.
                                     Monmouth Jct., NJ 08852
                                     732-329-0191

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  Calling case 13-CV-3519, Decter vs.

2  Second Nature Therapeutic Program.  Please state your

3  appearance for the record.

4    MR. KILGANNON:  For the Plaintiff, Timothy Kilgannon

5  of Kilgannon & Kilgannon, 1551 Kellum Place.  Good afternoon.

6    THE COURT:  Good afternoon.

7    MS. SAECHAO:  For the Defendant, Second Nature

8  Therapeutic Program, Tyra Saechao with Kaufman, Borgeest &

9  Ryan, 120 Broadway.

10    MS. YANNUCCI:  For Defendants Right Direction Crisis

11  Intervention, Skezics Corp. a.k.a. Skezics Corporation doing

12  business as Right Direction Crisis Intervention and Brian T.

13  Shepard, Lewis Brisbois Bisgaard & Smith, LLP by Cristina R.

14  Yannucci, 77 Water Street, New York, New York.

15    THE COURT:  Okay, good afternoon.  As you know we're

16  here with regard to the defense motion as well as the cross

17  motion and this a chance for you to highlight anything you'd

18  like to highlight from your papers.  I'll give you up to 15

19  minutes each.  Well, you don't have to take the whole 15

20  minutes, but to do that, so I'll let the Defendants' counsel

21  go first, okay?

22    MS. YANNUCCI:  Your Honor, on behalf of what has

23  been referred to as the Skezics Defendants, for purposes of

24  highlighting the arguments to the Court, based upon the papers

25  that have been submitted, we would argue that, as a matter of

1   law, this Court should be dismissing the complaint as filed

2   and denying the cross motion seeking leave to file the amended

3   complaint which is annexed to the papers as filed by the

4   Plaintiffs.  In sum, in support of our motion using --

5         THE COURT:  Can you just move the -- I'm having --

6   you can move that screen or your chair.

7         MS. YANNUCCI:  Oh.

8         THE COURT:  I can't even see you behind that screen.

9         MS. YANNUCCI:  You know what, why don't I stand?

10         THE COURT:  I'd say miss you, but you moved over,

11   but for a minute there I couldn't even see you.

12         MS. YANNUCCI:  Better?

13         THE COURT:  Yes, thanks.

14         MS. YANNUCCI:  Your Honor, we have annexed to our

15   papers a Custody Order and a Declaration of Authority.  What

16   the Custody Order does is establish for this Court that the

17   sole legal custodial parent of the minor Plaintiff, now having

18   attained majority age was his mother, who is a non-party,

19   Ellyn Sosin.  We submitted a Rule 56 statement should this

20   Court evaluate this motion pursuant to Rule 56 as opposed to a

21   Pleading Motion and we would highlight for this Court that

22   Plaintiffs do not dispute the existence and validity of the

23   Custody Order.  Their one argument with regard to the Custody

24   Order is that Ellyn Sosin's use of that Custody Order in

25   filing a declaration or signing a Declaration of Authority by

1   which she properly authorized the Skevic's Defendants should

2   not be permitted by this Court against public policy or some

3   other unidentified violation of statute.

4        First, Your Honor, we did file a letter noting that many

5   of the arguments contained in the Plaintiffs' reply papers

6   were improperly raised, and really should have been subject of

7   any opposition, and shouldn't be considered.  However, even if

8   they are, we would just identify or note to the Court, the

9   lack of any case law, which the Plaintiffs submit either by

10  their opposition or by their reply, which would permit this

11  Court to reject the Custody Order and Declaration of

12  Authority.  At its core, we have a parent who is not the

13  custodial parent.  Every case cited both in our papers, and I

14  believe in the papers submitted by Second Nature notes that in

15  order to afford any of the remedies or even to permit them to

16  go forward at this stage are based upon decisions issued by

17  challenges made by a custodial parent.  There is no dispute

18  here that the Plaintiff, Kenneth, is not a custodial parent,

19  or was not at the time of the acts alleged.  We detail

20  throughout our papers the basis for dismissal, but just

21  briefly, by the causes of action, we would note the first

22  cause of action is a false imprisonment claim made by the

23  minor, Andrew, now attaining majority age, and with regard to

24  that, we would rely on the lack of consent claim by the

25  Plaintiff and refer this Court to the Custody Order and the

1    Declaration of Authority, and specifically to the common law
2    in New York, which permits that there is a justification based
3    upon the legality of an alleged imprisonment if -- is a
4    defense to false imprisonment.  Here, we have a Custody Order
5    and we have a Declaration of Authority authorizing The
6    Skezics, the Defendants, to do that, which is exactly
7    challenged herein.  This is an example, also of where the
8    Plaintiffs are arguing about the Custody Order, but without
9    providing any case law for this Court to reject the import of
10   it and the basis for dismissal.

11       As regard to the assault, again this is a claim made only
12   by the child, Andrew, and with regard to that we would note
13   that the complaint is devoid of any factual pleadings that
14   Andrew feared imminent harm.  Now, Your Honor might note that
15   in their reply papers they raise, I'm sorry, the Plaintiffs
16   raise for the first time that Andrew had a {quote} {unquote}
17   "fear of imminent harm" and that this is to be evaluated
18   subjectively.  As noted before, we would ask the Court ignore
19   the arguments raised by Plaintiffs for the first time in their
20   reply, but even if this Court were to consider those
21   arguments, the case law cited by the Plaintiffs in support of
22   this claim, specifically Bram vs. Lussak Realty Corp. does not
23   support their position.  In the Bram case, the fear of
24   imminent harm was accompanied by a weapon, and here we have no
25   pleading of a weapon by the Skezics Defendants.  And I would

1    also highlight for this Court that there is no pleading with

2    regard to intent, and that any such summary claim of intent

3    would be expressly refuted by the Custody Order and the

4    Declaration of Authority.  It is with regard to this

5    allegation that I would note that the Plaintiffs raise for the

6    first time the whole public policy argument, holding that the

7    Declaration of Authority shouldn't be considered by this

8    Court, but neither of the cases cited by the Plaintiffs in

9    support of this argument, particularly Fox or Kidder support

10   such a thing, and in fact, we would submit that the

11   Declaration of Authority provides expressly otherwise, which

12   is that the Skezics Defendants ensured that the custodial

13   parent provided evidence of the custodial and legal right to

14   give the authority to Skezics to engage in this transport.

15   The intentional infliction of emotional distress are asserted

16   by both parent and son; however, with regard to that claim,

17   the case law squarely permits this Court to dismiss the Cause

18   of Action as a matter of law.  We've relied upon Spector in

19   the brief, and unless the Court has any specific questions, I

20   will move on, and just note that in their reply regarding this

21   claim, Plaintiffs argue for the first time that Andrew is

22   stating that he was terrified.  Again, this is improper, but

23   despite that fact, and even if this Court were to consider the

24   allegations submitted in a memo of law and reply, we would

25   note that the elements of an intentional infliction of

1  emotional distress does not permit a pleading of a conclusary
2  allegation of being terrified to adequately plead the required
3  elements.  With regard to tortuous interference by a parent,
4  or with parental rights, again we go back to the fact that
5  Kenneth really doesn't even have standard capacity to make
6  this argument as he was not the custodial parent, but with
7  regard to that, we think that the case law, specifically
8  McGrady and matter of Dylan squarely refute this since Kenneth
9  was not the custodial parent.  The claims really are, at their
10  essence, Your Honor, claims challenging Ellyn's actions with
11  regard to the minor child.  We would point out that one of the
12  cases cited by Plaintiffs in their briefs to try to rebut the
13  legal basis for dismissal is Pickle, and we would highlight
14  for this Court that Pickle actually supports the arguments
15  being made by Defendant, which is that the remedies, or the
16  claims being sought, and the remedies being sought, are claims
17  in Pickle that were being made by the lawful custodial parent,
18  and the Court does not have that situation here.

19      With regard to the alien of affections claim submitted by
20  both Andrew and Kenneth, the New York Civil Rights Law,
21  Section 80, squarely abolish that claim, and as a matter of
22  law, children in and of themselves do not have a cause of
23  action for an alienation of affection and I would note to the
24  Court that I believe that Plaintiffs' opposition and reply are
25  both silent as to this point, so summary dismissal would be

1     appropriate in that instance.

2          With regard to the abduction of a child asserted by

3     Kenneth, again, Your Honor, this is a claim asserted by the

4     non-custodial parent.  All of the case law indicates such a

5     claim is one to be made by the custodial parent.

6          In sum, with regard to the conspiracy claim, the punitive

7     damages claims, there are no facts in this complaint that

8     would warrant any ability to proceed on these claims.  In sum

9     and substance, the complaint, and the proposed amended

10    complaint, are replete with just the catch phrases from each

11    of these causes of action without the necessary facts to

12    support them.  The one argument that we would like to

13    highlight that is separate and apart from our co-Defendants is

14    that the Plaintiffs seek to pierce the corporate veil as

15    against the Skezics Defendants.  We would submit to the Court

16    that as first, and foremost, there isn't, or should not be

17    permitted to be a separate Cause of Action in this regard.

18    However, the complaint is devoid of any facts that Mr. Shepard

19    was in any way individually involved.  There were no single

20    representations or acts identified by the Plaintiffs with

21    regard to Mr. Shepard.  There are no facts tending to show

22    when any representations were made, or that there were any

23    actions or domination by Mr. Shepard of the corporate

24    entities.  And with regard to Mr. Shepard individually, we've

25    highlighted both the absence of any facts particularly as to

1   each of the causes of action as well as the absence of service

2   of process or personal jurisdiction.  We've submitted an

3   affidavit by Mr. Shepard in support of both of these arguments

4   and finally, Your Honor, we would note alternatively that the

5   failure to name Ellyn Sosin, who is an indispensable party

6   alone could also justify dismissal on the pleading, so unless

7   the Court has any questions, I would rest on the balance of

8   the papers.

9           THE COURT:  I don't have any questions at this

10  point, thank you.

11          MS. YANNUCCI:  Thank you.

12          MS. SAECHAO:  Good afternoon, Your Honor.  My name

13  is Tyra Saechao for the Defendant, Second Nature.  Just

14  briefly, Second Nature is a company that offers therapeutic

15  wilderness programs for troubled adolescents, and it was the

16  son, Andrew, who stayed at Second Nature's program in Utah for

17  27 days, and all of the acts alleged in the complaint, which

18  were on the basis of seven of the eight claims that are

19  asserted against Second Nature.  One of the key facts, which

20  is undisputed by all parties, is that Ellyn Sosin had legal

21  custody, sole legal custody, at the time of the acts alleged

22  in the complaint and as set forth by my co-counsel we join in

23  all of those arguments based on Kenneth's essentially lack of

24  standing to assert various claims such as false imprisonment,

25  tortuous interference with parental and visitation rights as

1   well as abduction.  In addition to the documents that were

2   already mentioned which Ms. Sosin executed, she also executed

3   on behalf of my client, Second Nature, a Power of Attorney,

4   and what the Power of Attorney did was delegate guardianship

5   over the care and custody of Andrew while he was enrolled in

6   its program.  She also signed a contract for services which

7   consented to Andrew's enrollment in the program and in that

8   contract for services, there is specifically a provision that

9   states that Second Nature does not have any responsibility or

10  liability for any of the travel or events that occurred during

11  Andrew's transport to its program.

12      We also would join in the arguments set force by my co-

13  counsel that each of the claims are insufficiently pled for

14  reasons they express and also for reasons expressed in our

15  moving papers as well.  And lastly, with respect to Second

16  Nature, the Plaintiff does make an argument in its opposition

17  papers that our motion should be denied for failure to submit

18  a Rule 56(1) statement.  As Courts have held in this district,

19  they have allowed the filing of a Rule 56(1) with the reply,

20  where the initial failure to prepare the statement was

21  promptly corrected and inadvertent which was done, excuse me,

22  done here.  We submitted it with our reply papers, and

23  Plaintiff did prepare a response to it.  Thank you.

24          THE COURT:  Okay.  Mr. Kilgannon, you're up.

25          MR. KILGANNON:  Thank you, Judge.  Good afternoon,

1    Your Honor.  As I stated earlier, my name is Timothy
2    Kilgannon, and I represent Andrew Decter and Kenneth Decter,
3    the Plaintiffs in this action, Andrew being the son, Kenneth
4    being the father.  What you have here, Your Honor, is a very
5    unique case.  It's not a case that I am confident comes before
6    this Court on a frequent basis.  It all started on June 20th,
7    2012 when Andrew was 16 years old.  Pursuant to a Judgment of
8    Divorce from the Nassau County Supreme Court, Andrew lived
9    with his mother and that same Judgment of Divorce mandated
10   daily telephone calls and bi-weekly visits for the father.
11   This all took place during the summer of 2012 when Andrew was
12   between his junior year and senior year at Manhasset High
13   School.  He was part of the Plandome Junior Fire Department.
14   He was a tuba player in his marching band and he was the
15   technical director of his theater program.  He had no criminal
16   record.  He had no problem with drugs or alcohol and he had no
17   behavioral problems with school.  All that being the case,
18   still Skezics, under the cloak of darkness came into Andrew's
19   room early in the morning on June 20th.  Three men came into
20   his room.  He was unaware that anyone would come in.  His
21   father was unaware that anyone would come in.  Two stood over
22   his bed, one at his bedroom door.  They all displayed
23   handcuffs and they refused to allow him to leave.  He asked
24   numerous times to speak to his father, to speak to his lawyer,
25   and they refused.  They escorted him in a car which prevented

1   his escape because it had no interior handles to allow him to
2   leave.  They brought him through the airport, and they
3   transported him, more or less like a prisoner, to Utah.  They
4   brought him all the way to Utah.  They knew where to bring
5   him, when to bring him and Second Nature knew that he was
6   coming.  They worked together to bring him to Second Nature.
7   They brought him to Second Nature's Camp, and they brought him
8   out into the wilderness.  Each night they took his shoes to
9   prevent his escape.  They gave him prisoner-type clothing so
10  that he would not be able to escape.  The prison guards
11  carried knives and mace.  If any child tried to escape, they
12  performed an act which Andrew described as tarping someone,
13  where they would pin a child down by putting a sleeping bag
14  over him and having two guards sleep on either side of the
15  child.  Now Kenneth was at home on June 20th, and he became
16  alarmed when he didn't hear from his son.  So they speak to
17  each other on a daily basis, so finally, after Kenneth made
18  numerous phone calls he found out June 21st that his son was
19  taken to Utah.  He called Second Nature and they told him that
20  they can neither confirm nor deny if they're holding his 16-
21  year-old son.  They got Andrew's and Kenneth's attorney
22  involved, a gentleman named Michael Weinstock.  Michael
23  Weinstock sent them a copy of this Divorce Decree which stated
24  that Kenneth is entitled to daily phone calls and bi-weekly
25  visitation.  Kenneth pleaded with them to return Andrew, but

 1    they refused, and Kenneth isn't a man of wealth or great
 2    means, but he was forced to petition the Court for a Writ of
 3    Habeas Corpus.  He went through extensive motion practice and
 4    finally when the petition was granted, and they were ordered
 5    to return, they returned Andrew on July 17th, 2012, but he
 6    returned unescorted.  Judge, their claim is basically that we
 7    have failed to sufficiently plead the false imprisonment,
 8    kidnapping, abduction, assault, intentional infliction of
 9    emotional distress, tortuous interference of parental rights
10    and the alienation of affections.  I believe that these claims
11    have been sufficiently pled.  Just to highlight certain areas
12    in each of these claims:  On the false imprisonment claim, it
13    is certainly true that they intended to confine Andrew.  It is
14    certainly true that Andrew was conscious of that confinement.
15    He told them numerous times he wanted to leave.  The question
16    is whether the confinement was justified or not.  The
17    Defendants claim that this confinement and this transport was
18    justified based upon the Declaration of Authority or the Power
19    of Attorney, both of which we think are unenforceable and
20    cannot allow the Defendants to violate my client's rights.
21    What they're saying, Your Honor, is basically don't look at
22    us, she told us to do it.  So I don't think that that's a
23    claim that should withstand.  There's a very longstanding and
24    established rule that you cannot contract to do something
25    that's illegal, immoral or unenforceable.  It dates back to a

1   case that I found <u>Oscanyon v. Arms Company</u>, which is a U.S.

2   Supreme Court from 1880, but I would argue that it dates back

3   even further than that.  The Defendants argue that we asserted

4   this claim late, but when we asserted it, we asserted it in

5   response to their opposition, which said that our claims were

6   insufficiently pled, and we asserted that in our reply, and we

7   stated that this Declaration of Authority and this Power of

8   Attorney should not be held as enforceable.  Furthermore, I

9   don't think that any Judgement of Divorce allows for the

10  Defendants to commit assault against a 16-year-old child.

11  They put him in fear of imminent harm, and it was stated in

12  the complaint numerous times that Andrew was terrified.  It

13  wasn't the first time that it was stated when we opposed the

14  motion, and clearly Andrew could have been put in fear by

15  their actions.  As for Skezics, they snuck into his room.  He

16  tried to leave and they restrained him.  They had displayed

17  handcuffs, and they continually told him not to escape.  As

18  for Second Nature, the guards there held knives, held a knife

19  and mace.  Each of them held a knife and mace.  They took

20  action which made Andrew believe that if he tried to escape

21  they would pin him down, and they would keep him there.  Now,

22  as for the intentional infliction of emotional distress, we

23  must show extreme or outrageous conduct, acts that were done

24  with intention, a causal connection between the actions and

25  the injury, and severe emotional distress.  It is our position

1   that the actions of kidnapping a 16-year-old child, entering

2   his room unannounced, and bringing him across state lines into

3   a wilderness camp or prison is certainly extreme or

4   outrageous. It cannot take place here, and it cannot be held

5   to be justified simply because they believe that they were

6   told to do this, and certainly these acts were done with

7   intention.  They purposefully snuck into his room.  They

8   purposefully refused to allow him to speak to his father.

9   They purposefully refused to allow him to speak to his

10  attorney.  As for Second Nature, they brought him into the

11  wilderness.  They took his shoes each night when he went to

12  bed to prevent his escape.  They put on those prison uniforms

13  to delegate him as a prisoner.

14      Now as a result of these actions, Andrew came home, he

15  was fearful.  He couldn't sleep.  He was worried that men

16  would show up in his room again to abduct him, and he

17  continues to see a therapist.  Now, we also made a claim for

18  tortuous interference with parental rights.  The Defendants

19  argue against the tortuous interference and abduction, and

20  those arguments are twofold.  It fails because it can only be

21  asserted against the other spouse or parent, and it fails

22  because Kenneth doesn't have legal custody.  As for it failing

23  because it can only be held against a parent, the Defendants

24  incorrectly rely on McGrady vs. Rosenbloom.  In that case,

25  Defendant Skezics relied on it, and the McGrady case actually

1   says, and it explicitly held that no cause of action exists

2   when the Defendant is a parent with superior rights.  In such

3   a case, the Court there held that the proper remedy rests

4   against the spouse who violated a Visitation Order, and the

5   facts in this case, before this Court are dissimilar in that

6   Mr. Decter's rights are violated by a third party and no other

7   alternative remedy exists against this third party.

8       Now furthermore in case known as <u>Sager v. Rochester</u>

9   General, and this is a Monroe County Supreme Court action from

10  1996, and the Court of Appeals case in Pickle vs. Page, both

11  of those actions are actions where the parents brought actions

12  against third parties, and both of those actions show that

13  this Court has authority to make a ruling against the

14  Defendants here.  Their next argument was that Kenneth had no

15  legal custody to Andrew, and therefore cannot assert his

16  rights to his visitation and his daily phone calls.

17      Your Honor, its been held time and time again, that

18  willful interference with a non-custodial parent's rights to

19  visitation is so inconsistent with the best interest of the

20  child.  Now although best interest is a premise that's used in

21  custodial proceedings, if we're not here to protect the rights

22  of our child, of the children, why are we here?  The best

23  interest of the child should be paramount to everything.  It

24  should not be dependent on what Courtroom we're in, whether

25  we're in Family Court, Supreme Court, Federal Court, the best

1    interest of the child is what is most important, and that is

2    that the child has the right to communicate with his father as

3    the Court had previously ordered.  Furthermore, Your Honor,

4    just because a father, or another parent, has visitation or

5    communication rights that aren't as frequent, or aren't as

6    often as the other parent does not mean those rights should

7    not be protected.  What if they were to take the child for two

8    months, three months, two years, five years, ten years, does

9    that mean Kenneth doesn't have a right to protect his interest

10   to communication and visitation.  I don't think that that is

11   what this Court should hold in such a case like this.  This

12   Court must protect Kenneth's rights.  Your Honor, as for

13   the --

14          THE COURT:  Doesn't that overlook the fact that

15   there is a remedy for that to sue the custodial parent, that

16   an action could be brought against the custodial parent.  It's

17   not as if there is no remedy to the types of situations that

18   you're discussing.  Wouldn't that be a clear remedy for any

19   such action by a custodial parent?

20          MR. KILGANNON:  But what that does, Your Honor, is

21   it lets the Defendants off the hook.  He should have a right

22   to protect his right against every person, whether it's the

23   parent or a third party.

24          THE COURT:  But give me a single case in New York,

25   or even, I'll even look at any other case you can cite in the

1    United States where a non-custodial parent, and I emphasize

2    non-custodial parent, has successfully brought an action

3    against a third party for interference with visitation rights,

4    any case in New York or anywhere else because I haven't found

5    one.

6         MR. KILGANNON:  Your Honor --

7         THE COURT:  You didn't cite any in your papers and

8    my belief is that there is no such case, but I'm willing to

9    listen if there is one.

10        MR. KILGANNON:  Your Honor, I have done the research

11   and I think what you have before you, as I stated right in the

12   beginning, is a unique case, but it doesn't mean that there

13   should never be a right.  Just because it was never done

14   before doesn't mean there should never be a right.  As I said,

15   what if the mother instead of taking the child to Utah took

16   the child to Bulgaria and never returned the child.  He

17   couldn't communicate with the child.  He couldn't ever see the

18   child again?

19        THE COURT:  I know, but the flip side is you can

20   have all sorts of situations if such a cause of action existed

21   against third parties, schools.  If a custodial parent places

22   a kid in a school and the non-custodial parent shows up and

23   says I'm supposed to have visitation rights today, I want to

24   take the kid home, and the school says no, you're not doing

25   that, then they can be sued over every little issue of

1    visitation.  Third parties when confronted with a non-

2    custodial parent could be subject to a lawsuit, and that

3    certainly has a lot of ramifications doesn't it?

4              MR. KILGANNON:  Agree, Your Honor, but this isn't a

5    situation where Kenneth just showed up.  Second Nature and

6    Skezics both knew of his right.  They both consciously

7    disregarded his right and they took Andrew and refused to

8    allow any visitation or communication.

9              THE COURT:  What about the McGrady case?  Didn't the

10   Court reject the whole theory of third party liability in this

11   type of situation where the custodial parent consented to the

12   alleged interference and --

13             MR. KILGANNON:  I don't believe, oh sorry.

14             THE COURT:  Is that -- are you familiar with that

15   one?

16             MR. KILGANNON:  Yes, the McGrady case --

17             THE COURT:  And it distinguished the case that you

18   point to which is Pickle v. Page, which I think, as you know,

19   involved a lawful custodian right?

20             MR. KILGANNON:  Uhm-hum.  Well I think in the

21   McGrady case, the Court simply held that no cause of action

22   exists when the Defendant is a parent with superior rights,

23   but as for actions where a parent who has visitation or

24   communications, I don't think the Court specifically ruled on

25   that case or situation.

1          THE COURT:  Didn't the case involve the mother's

2    parents being accused of assisting a mother who had lawful

3    custody into depriving the Plaintiff of visitation right.

4    Isn't that what that case was about, McGrady?

5          MR. KILGANNON:  I believe that was the case, Your

6    Honor, yes.

7          THE COURT:  So how is that different from this case?

8    It's the same type of -- I don't understand factually how

9    that's different from what you're alleging here.  What's the

10   difference?  Maybe you can say you think it's wrongly decided,

11   but I'm trying to figure out whether there's any factual

12   distinction.

13         MR. KILGANNON:  Your Honor, I would -- as for the

14   McGrady case, I would say that it is different here.  I mean I

15   would say that you have a situation where it's a complete

16   third party, not related to the Decters in any way, shape or

17   form, that decided they would take it upon themselves to bring

18   Andrew to Utah.

19         THE COURT:  There's another case, I don't remember

20   now if it was in the briefs or not, but Leonard v. United

21   States.  It's a Second Circuit case where the father had been

22   granted visitation rights after divorce, the Defendant's

23   mother had custody of the children and the mother and the

24   children entered protective custody in connection with

25   organized crime, prosecution and the Second Circuit stated

1   that there was no claim for abduction or false imprisonment

2   because the mother had legal custody of the children and

3   consented to their placement in the program, and that the

4   father's visitation rights did not create a cause of action

5   against third parties.  Isn't that analogous to this

6   situation?  In that case you had the same type of thing,

7   visitation rights being interfered with because of the

8   protective custody.  Second Circuit says no cause of action

9   against the third party.

10          MR. KILGANNON:  I'm not familiar with that case,

11  Your Honor, but I do believe, and I think it would be wrong to

12  rule in any other way, that Kenneth has a right to protect his

13  interests in the visitation and communication with his son,

14  and Andrew has a right to protect his interest in the

15  visitation and communication with his father.

16          THE COURT:  I know, but the mother also has the

17  right to make the custodial decisions regarding where he goes

18  to camp or other places as well, vis-a-vis at least third

19  parties that's the issue really, right?  Didn't she have the

20  sole custody and the ability to decide where he should go to

21  camp, or school or anything like that, right?

22          MR. KILGANNON:  I don't think she had the right to

23  completely disregard, you know, Kenneth's right to visitation

24  and even Andrew's right to be free from any sort of false

25  imprisonment like this, or the treatment that he was given by

1    the Defendants while he was in their custody.

2            THE COURT:  Okay.  All right, thank you.

3            MR. KILGANNON:  Thank you.

4            THE COURT:  I'll give you each one minute to respond

5    if you wish to respond.

6            MS. YANNUCCI:  Your Honor, on behalf of Skezics, we

7    think the Court hit the nail on the proverbial head.  Much of

8    Mr. Kilgannon's argument devolves into a challenge to the

9    Custody Order, a challenge to Ellyn Sosin's authority to make

10   determinations pursuant to that Custody Order, and is inviting

11   the Court basically to intercede in the already adjudicated

12   rights, or the rights as they existed on the dates of the

13   incidents here.  Mr. Kilgannon was unable to identify by case

14   law or statute any basis upon which these claims either on

15   behalf of Kenneth, or on behalf of Andrew should be permitted

16   to proceed, so unless the Court has any other questions, we

17   will again rest on our papers, and thank you for the

18   opportunity to be heard.

19           THE COURT:  I don't have any other questions Ms.

20   Yannucci.  I do want you to address what occurred, Ms.

21   Yannucci actually, I guess.  No, I'm sorry, I got it mixed up.

22   Ms. I'm going to pronounce your name wrong.

23           MS. SAECHAO:  Saechao.

24           THE COURT:  Saechao.  I'm sorry, Ms. Yannucci, the

25   issue of what occurred at the camp itself and whether or not

1   any of that would be actionable in terms of how he was treated

2   at the camp, independent of the issue of the interference with

3   visitation.  Can you address that?

4   MS. SAECHAO:  Sure.  So the allegations concerning -

5   - against Second Nature with respect to what happened at the

6   camp, those are also insufficient.  The only factual

7   allegations against second nature that the Plaintiff raises,

8   really he raises in his motion, in his proposal to amend the

9   complaint.

10  THE COURT:  Right.

11  MS. SAECHAO:  So they're essentially new facts, and

12  those have to do --

13  THE COURT:  So why shouldn't I give him leave to

14  replete to add those facts for purposes of those other claims?

15  MS. SAECHAO:  Because even so, they're still

16  insufficient to state claims --

17  THE COURT:  Why not?

18  MS. SAECHAO:  With respect to, I can go through most

19  of them.  With respect to, well the false imprisonment, the

20  tortuous interference and the abduction, those really go to

21  the standing.

22  THE COURT:  Right.

23  MS. SAECHAO:  There's no legal custody.  The other

24  claims, alienation of affections, just briefly, is barred by

25  the Hart Balm Act, the New York Civil Rights Law, Section

1    80(a), and then the last three, assaults, intentional

2    infliction of emotional distress and conspiracy all address

3    those.  Assaults, in the initial complaints, the only

4    allegations really regarded Andrew's transport to Second

5    Nature.  In his Motion to Amend, he now asserted for the first

6    time that the Second Nature instructors carried a knife and

7    carried mace.

8         THE COURT:  Right, and forcibly wrestled and

9    restrained, right?  Didn't he allege that too, or no?

10        MS. SAECHAO:  Not him, specifically, but I believe

11   they said he allegedly viewed that occurring to other campers.

12   Our client has confirmed that with respect to the knife, it

13   was a utility knife that they use for woodcarving purposes.

14   The mace, it's not mace.  It's actually bear spray since

15   they're in the wilderness, they need bear spray, and neither

16   of those, neither the knife or the bear spray were ever used

17   or have ever been used against a camper.  With -- and also,

18   the documentation -- our client's position is that no one was

19   actually restrained during the 27 days that Andrew was in the

20   program.  With respect to the intentional infliction of

21   emotional distress claim, those also fail.  All he alleges in

22   support of that claim is that the shoes were removed at night,

23   and that is part of the safety and security protocols of the

24   camp since the, you know, campers are staying together at

25   night, they don't want campers to wander around the wilderness

1    by themselves when it's dark out, so that's why the shoes are

2    removed.  He also alleges that Kenneth had no contact with

3    Andrew.  Second Nature actually advised Kenneth of Andrew's

4    progress throughout, and they had a policy that allowed

5    letters to be written back and forth, but Kenneth never wrote

6    any such letters to Andrew, at least they were not in receipt

7    of any, and with respect to conspiracy, the final claim, there

8    still is no intent, and he hasn't pointed to any agreement

9    between Second Nature and Skezics.

10          THE COURT:  Okay.  Mr. Kilgannon, the issue with the

11   -- thank you, the Summary Judgment issue, they did file the

12   reply, the 56(1) statement but you did get a chance to respond

13   to that, so I don't know what prejudice there is.  Is there

14   any reason why I can't also consider this in Summary Judgment

15   as well, to consider extrinsic documents in evidence?

16          MR. KILGANNON:  I responded to it, Your Honor,

17   respectfully, to protect my client's rights, but I think

18   there's --

19          THE COURT:  But that's normally my -- even if

20   someone objects to the lack of what I usually tell the other

21   side file one and then give you a chance to respond, which

22   you've done, right?  So what prejudice is there at this point?

23          MR. KILGANNON:  My argument would be, and I

24   understand Your Honor's point, but my argument would be that

25   they failed in their first filing of their Motion for Summary

1   Judgment to allege the facts sufficient to grant the Summary

2   Judgment Motion, but that being said, I understand Your

3   Honor's point.

4           THE COURT:  And then it -- on this his issue?  Are

5   you alleging that he himself was assaulted, or that he

6   observed the assaults?  I guess I'm confused on that issue.

7           MR. KILGANNON:  Well in the camp itself, the

8   tarping, which I discussed never took place on Andrew, but he

9   saw what happened there to a child who tried to wander off, to

10  try to escape, and he saw what happened there.  The assault

11  more or less took place when Andrew was taken from his home,

12  then when he first woke up, he had tried to escape and was

13  restrained by the transporters, the Skezics transporters.

14          THE COURT:  Okay, okay I understand that part of it.

15          MR. KILGANNON:  Yeah.

16          THE COURT:  Okay, I'm going to reserve decision.  I

17  want to go back and look at some of the things we discussed.

18  I appreciate everybody coming in.  Okay, thank you.

19          MR. KILGANNON:  Thank you, Judge.

20          MS. SAECHAO:  Thank you.

21      (Court adjourned)

22

23

24

25

1                                  **CERTIFICATION**

2    I certify that the foregoing is a correct transcript from the

3    electronic sound recording of the proceedings in the above-

4    entitled matter.

5

6

7                                                          10/24/14

8

9  _____

10   Signature of Transcriber               Date